UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **INGRID JOHANNA CORZO ARMAS** | **CASE NO.  6:20-CV-00741 SEC P** |
| **VERSUS** | **JUDGE ROBERT R. SUMMERHAYS** |
| **INDALECIO RAMOS, ET AL** | **MAGISTRATE JUDGE WHITEHURST** |

### REPORT AND RECOMMENDATION

Before the court is a Petition for Writ of Habeas Corpus, filed pursuant to 21 U.S.C. § 2241 by Ingrid Johanna Corzo Armas ("Armas"), through counsel. Rec. Doc. 1. Armas, a forty-nine-year-old native and citizen of Guatemala, is immigration detainee subject to mandatory detention following her re-entry into the United States after an Immigration Judge ordered her removed in 1999. She seeks a conditional release from the South Louisiana ICE Processing Center ("SLIPC").

This matter has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of this court. For the reasons stated below, **IT IS RECOMMENDED** the Motion for Temporary Restraining Order and Petition for Writ of Habeas Corpus (rec. doc. 1) be **DENIED**.

I.  **Background**

   A. **Status of Immigration Detention**

Ingrid Johanna Corzo Armas, a 49-year-old native and citizen of Guatemala, was convicted in the United States in 1995 on murder and kidnapping charges. Rec. Doc. 15-1, ¶ 39.  She was subsequently determined to be removable pursuant to Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act (the Act) for having been an immigrant that at any time after admission was convicted of an aggravated felony as defined in section 101(a)(43) of the Act. *Id.*  On May 26, 1999, Petitioner appeared before an immigration judge and was ordered removed from the United States to Guatemala. *Id*.  Petitioner was then removed from the United States. *Id.*

Petitioner unlawfully re-entered the United States at an unknown location and unknown time. *Id*.  She was arrested on February 19, 2020, and on February 20, 2020, appeared before United States Magistrate Judge M. Page Kelley in the United States District Court for the District of Massachusetts on a single charge of unlawful re-entry of a deported alien in violation of 8 U.S.C. § 1326. See Rec. Doc. 1, p. 2.  A detention hearing was held on February 24, 2020, where Petitioner consented to voluntary detention. *Id*.  On March 11, 2020, Petitioner pleaded guilty and was sentenced to time served. *Id*. On an unknown date following March 11, 2020, Petitioner was transferred to the custody of Immigration and Customs Enforcement for deportation and has been held in their custody since (approximately 78 days at

the time of the filing of her petition). *Id*. She is being processed for reinstatement of a prior removal order and awaiting travel to Guatemala. Rec. Doc. 15-1, ¶ 39.

### B. Petitioner's Health

Petitioner alleges that she has been diagnosed with essential hypertension, diabetes mellitus 2, and mixed hyperlipidemia, which makes her especially susceptible to risks associated with complications of COVID-19. Additionally, Petitioner suffers from obesity and weighs over 300 pounds. She argues that these conditions leave her vulnerable if she is exposed to COVID-19.

The Government represents that her medical conditions are under control and that she is under consistent observation by medical staff members and receiving medication and treatment for her conditions. See Rec. Doc. 15-1, ¶ 37.

### C. Uniform Precautionary Measures Taken Against COVID-19 at SLIPC

The precautionary measures taken against COVID-19 at SLIPC, as set forth by the Respondents, as as follows:

Education

- Facilities are educating detainees and staff about COVID-19, including the importance of hand washing and hand hygiene, covering coughs with the elbow instead of with hands, and requesting to seek medical care if they feel ill. *See* Gvmt. Ex. A, Rec. Doc. 15-1, ¶ 34

- COVID-19 education is provided to all detainees through instructional videos and postings delivered directly to the detainee's personal tablet device. *Id*. ¶ 15.

- SLIPC has posted COVID-19 educational materials—such as information about the virus, how to prevent its spread (including encouraging social distancing and demonstrating good hygiene practices), outlining the steps ICE is taking relating to COVID-19—throughout Jackson Parish, including in housing units, gathering spaces and common areas, and medical units. *Id*. ¶ 14.

Personal Protective Equipment

- SLIPC provides masks to all detainees and staff three (3) times per week *Id*. ¶ 30. Each detainee and staff member is required to wear them.

- Staff are instructed to use PPE. *Id*.

Hygiene and Sanitation

- The SLIPC has increased the frequency of sanitation through the frequent disinfection of high touch surfaces; the cafeteria and recreation yard are sanitized after each pod moves through; and there are increased number of sanitation workers across the facility. *Id*.

- Each detainee is provided with shampoo/body wash, tissue paper, and other hygiene products. Additional hygiene products are furnished upon request. *Id*.

- There have been no shortage of supplies and facility inventory levels are monitored to assure adequate supplies are readily available for future use. *Id*.

- Living areas are sanitized by staff four (4x) times/day with sanitizing spray. *Id*.

- Jackson Parish has implemented intensified cleaning of surfaces and objects that are frequently touched, especially common areas including telecommunication devices, telephones and adjoining areas, etc. *Id*.

Social Distancing

- The PRR recommends making efforts to reduce the detained population at ICE facilities to 75% of capacity. SLIPC (16.7%) has far exceeded that target. *Id*. ¶ 8.

- There is daily monitoring of the population percentage at each housing unit. The goal is to facilitate social distancing, as much as practicable. *Id*. ¶ 12

- SLIPC has limited professional visits to noncontact visits and suspended in personal social visitation and facility tours. *Id*. ¶ 31.

- There are three recreation yards at SLIPC. Detainees permitted on the recreation yard at a time is limited to 30-40. *Id*. ¶ 13.

Medical Care

- Specialty and hospital care are provided through an off-sight provider as needed. *Id*. ¶ 28

- SLIPC provides daily access to "sick calls" (sick call procedure allows detainees the unrestricted opportunity to freely request health care services) in a clinical setting as well as access to hospital care. Specialty and hospital care are provided through and off-sight provider as needed. *Id*. ¶.

- Detainees who present symptoms compatible with COVID-19 will be placed in isolation and tested. If testing is positive, they will remain isolated and treated. If a detainee experiences clinical deterioration, the detainee will be transferred to a local hospital. *Id*. ¶ 27.

- Facilities quarantine detainees who are suspected of having COVID-19 by placing them in special housing units. *Id*. ¶ 35.

- In cases of known exposure to a person with confirmed COVID-19, asymptomatic detainees are placed in "cohorts" with restricted movement for the duration of the most recent incubation period (14 days after most recent exposure) and are monitored daily for fever and symptoms of respiratory illness. Those that show onset of fever and/or respiratory illness are referred

to a medical provider for evaluation. Cohorting is discontinued when the 14-day incubation period completes with no new cases. *Id.* ¶ 26.

Detainee Intake

- The facilities screen all detainee-intakes when they enter, including taking travel and medical histories and checking body temperatures. The facilities also have procedures in place to continue monitoring the populations' health. *Id.* ¶ 33.

- The detainee's responses and the results of these assessments will dictate whether to monitor or isolate the detainee. Detainees who present symptoms compatible with COVID-19 will be placed in isolation (such as in a negative pressure room) and tested. If testing is positive, they will remain isolated and treated. If a detainee experiences clinical deterioration, the detainee will be taken to a local hospital. *Id.* ¶ 25.

- Detainees also are screened for disabilities, identified disabilities are further evaluated, and reasonable accommodations are provided as medically appropriate. *Id.* ¶ 23.

Notably, the Government reports that as of 1 p.m. on June 24, 2020, SLIPC had no known cases of COVID-19, there were no suspected cases of COVID-19 among the detainees at SLIPC, and SLIPC has not previously had any known cases of COVID-19. *Id.* ¶ 29.

## II.   Law & Analysis

### A. Jurisdiction

To the extent that Petitioner seeks release based on the allegation that during her detention she is being insufficiently protected from COVID-19, Respondents argue that the Court lacks jurisdiction to consider this claim under 28 U.S.C. § 2241, contending that it is a conditions of confinement claim, properly brought pursuant

to a civil rights action. Rec. Doc. 15 p. 16. This argument is based upon the distinction between claims concerning "conditions of confinement" ("conditions claims") and claims concerning "fact or duration of confinement" ("fact claims").

A detainee may, and should, assert "fact or duration" claims under § 2241. *See Poree v. Collins*, 866 F.3d 235, 243 (5th Cir. 2017). Generally, habeas petitions seek release from custody, while civil rights actions are the proper vehicle to attack unconstitutional conditions of confinement. *Carson v. Johnson*, 112 F.3d 818, 820 (5th Cir. 1997) (first citing *Pugh v. Par. of St. Tammany*, 875 F.2d 436, 439 (5th Cir. 1989), then citing *Cook v. Tex. Dep't of Crim. Justice Transitional Planning Dep't*, 37 F.3d 166, 168 (5th Cir. 1994)). However, the line between claims concerning "conditions of confinement" ("conditions claims") and claims concerning "fact or duration of confinement" ("fact claims") is "a blurry one." *Vazquez Barrera v. Wolf,* No. 4:20-CV-1241, 2020 WL 1904497, at *10 (S.D. Tex. Apr. 17, 2020) (*quoting Poree v. Collins*, 866 F.3d 235, 243 (5th Cir. 2017). Where an individual is "challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release," the proper remedy is a writ of habeas corpus. *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973). The Fifth Circuit has granted habeas relief in the past where the petitioner was seeking immediate release from prison, even where the dissent objected that the case

involved conditions of confinement. *Coleman v. Dretke*, 409 F.3d 665, 669-70 (5th Cir. 2005).

Conditions of confinement bear on the constitutionality of continued detention. *Mays v. Dart,* No. 20 C 2134, 2020 WL 1812381, at *6 (N.D. Ill. Apr. 9, 2020). If no set of conditions is sufficient to protect a detainee's constitutional rights, his claim for relief is cognizable in habeas. *See Malam v. Adducci*, No. 20-10829, 2020 WL 1672662, at *3 (E.D. Mich. Apr. 5, 2020), *as amended* (Apr. 6, 2020). Because Petitioner challenges the validity of her continued confinement and because she seeks immediate release from confinement as the remedy, the Court finds that Petitioner, an ICE detainee who contends to be at an elevated risk of contracting COVID-19 in a detention facility, and seeks immediate release, may do so through a "fact or duration" claim asserted under 28 U.S.C. § 2241. *See Dada, et al. v. Witte, et al*., 1:20-CV-458, Rec. Doc. 17 (W. D. La., April 30, 2020); *see also Cesar Fortuny Diaz v. Barr, et al*, 6:20-cv-425, Rec. Doc. 20 (W.D. La., June 2, 2020).

### B. Temporary Restraining Order

Under well-settled Fifth Circuit precedent, a temporary restraining order is an extraordinary remedy that should not be granted unless the movant establishes the following four elements by a preponderance of the evidence: "(1) there is a substantial likelihood of success on the merits; (2) there is a substantial threat that

irreparable injury will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) granting the preliminary injunction will not disserve the public interest." *Karaha Bodas Co. v. Perusahaan Pertambangan*, 335 F.3d 357, 363 (5th Cir. 2003). A TRO, like all injunctive relief, is an extraordinary remedy requiring the movant to unequivocally show the need for its issuance. *Sepulvado v. Jindal,* 729 F.3d 413, 417 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1789 (2014) (internal citations and quotations omitted). The party moving for a TRO must carry the burden as to all four elements before a TRO may be considered. *Cf. Voting for America, Inc. v. Steen,* 732 F.3d 382, 386 (5th Cir. 2013) (internal quotations and citations omitted).

A preliminary injunction is an extraordinary remedy. *Miss. Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 621 (5th Cir. 1985). It should only be granted if the movant has clearly carried the burden of persuasion on all four prerequisites. *Id*. The decision to grant a preliminary injunction is to be treated as the exception rather than the rule. *Id*. (*citing State of Texas v. Seatrain Inter. S.A*., 518 F.2d 175, 179 (5th Cir. 1975)). To obtain an injunction, the movant's likelihood of success must be more than negligible, *Compact Van Equipment Company, Inc. v. Leggett & Platt, Inc.,* 566 F.2d 952, 954 (5th Cir. 1978), and the preliminary injunction should not be granted unless the question presented by the litigant is free

from doubt. *Congress of Racial Equality v. Douglas*, 318 F.2d 95, 97 (5th Cir.), *cert. denied*, 375 U.S. 829 (1963).

It is also well-settled that "an injunction should be no more burdensome to the defendant than necessary to provide complete relief." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). In determining whether relief should be granted, a "[t]he district court must narrowly tailor an injunction to remedy the specific action which gives rise to the order." *In re Abbott*, ⸺ F.3d ⸺ ⸺, 2020 WL 1911216 (5th Cir. Apr. 20, 2020) (*citing John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004).

### *a. There is not a substantial likelihood of success on the merits.*

While Petitioner's claims are properly before this Court, they lack merit, and as such, Petitioner is unable to establish the first element required to succeed. As Petitioner is a civil detainee, her conditions of confinement claims are, like pretrial detainees, governed by the Due Process Clause. *See Hare v. City of Corinth,* 74 F.3d 633, 638-639 (5th Cir. 1996) (en banc). Due process under the Fifth Amendment "requires that a pretrial detainee not be punished." *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). Though the state has a recognized interest in detaining defendants for trial, the substantive limits on state action set by the Due Process Clause provide that the state cannot punish a pretrial detainee. *Id*. at 535. In this circuit, the legal standard used to measure the due process rights of pretrial detainees depends on whether the detainee challenges the constitutionality of a condition of his confinement or

whether he challenges an episodic act or omission of an individual state official. *Estate of Henson v. Wichita Cty., Tex.*, 795 F.3d 456 (5th Cir. 2015).

In *Hare*, the Fifth Circuit created two standards for conditions-of-confinement claims depending on the nature of the allegation. The court held "that the episodic act or omission of a state jail official does not violate a [civil] detainee's due process right to medical care . . . unless the official acted or failed to act with subjective deliberate indifference." *Hare*, 74 F.3d 638-639. Alternatively, "[c]onstitutional attacks on general conditions, practices, rules, or restrictions of pretrial confinement," or "jail condition cases," are governed by the reasonable relation test articulated in *Bell v. Wolfish,* 441 U.S. 520 (1979). When a Petitioner is challenging his conditions of confinement, this court applies the test established by *Bell* and asks whether the condition is "reasonably related to a legitimate governmental objective." See *Hare*, 74 F.3d at 646. "[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." *Bell*, 441 U.S. at 539. Where "a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id*.

Petitioner argues that her health distinguishes her from a typical detainee and any measures derived to mitigate the spread of infection, even perfectly executed, are inadequate to protect her. Rec. Doc. 1, p. 8.

Petitioner may only succeed on her substantive due process claims by establishing that detention does not reasonably relate to a legitimate governmental purpose. *See Dada, et al., supra.* She may make this showing, for example, by proving that, due to her age, immune deficiencies, or other comorbidities, she faces an elevated risk of contracting the virus, or suffering serious illness from it; that her particular circumstances also heighten these risks; and that preventive measures are difficult or impossible, leaving her unduly exposed to contracting the virus. *Id. (citing Vazquez Barrera,* 2020 WL 1904497, at *5 ("Here, the Court finds that detention of Plaintiffs, who are at high risk of serious illness or death if they contract COVID-19, in MPC, where social distancing and proper hygiene are impossible, does not reasonably relate to a legitimate governmental purpose.").

Petitioners' claims must be distinct in some respect. *See Martinez Franco v. Jennings*, No. 20-CV-02474-CRB, 2020 WL 1976423, at *3 (N.D. Cal. Apr. 24, 2020) ("Franco does not identify, and the Court has not seen, a case finding that increased likelihood of contracting the virus rendered unconstitutional the detention of a person without underlying medical conditions or some other vulnerability."). The Fifth Circuit has explained that "[t]he incidence of diseases or infections,

standing alone,' do not 'imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks.'" *Valentine v. Collier,* No. 20-20207, 2020 WL 1934431, at *3 (5th Cir. Apr. 22, 2020) (*quoting Shepherd v. Dallas Cty.*, 591 F.3d 445, 454 (5th Cir. 2009)). This Court has already concluded the same: "[P]risoners are not entitled to release or transfer based solely on generalized COVID-19 fears and speculation." *Riggs v. Louisiana*, No. CV 3:20-0495, 2020 WL 1939168, at *2 (W.D. La. Apr. 22, 2020). Otherwise, the claims of any prisoner or detainee would be equally meritorious – or equally meritless – notwithstanding their individual situations. That result would be untenable. *Dada, supra.*

To separate meritorious claims from generalized risk, some courts have focused upon underlying detainees' medical conditions, detainees' criminal histories or tendency toward violence, and the detention facility's response to the pandemic. *Dada, supra (citing Vazquez Barrera*, 2020 WL 1904497, at *6). Another court distilled a "nonexhaustive list of factors" to be considered. *Id. (citing Saillant v. Hoover,* No. 1:20-CV-00609, 2020 U.S. Dist. LEXIS 67451, 2020 WL 1891854 (M.D. Pa. Apr. 16, 2020), at *4. This Court will reconcile those approaches. *See Dada, Diaz, supra.*

In addressing the merits of Petitioners' requests for habeas relief, the undersigned thus considers the following non-exhaustive list of factors:

    (1)  whether the petitioner has been diagnosed with COVID-19 or is experiencing symptoms consistent with the disease;

    (2)  whether the petitioner is among the group of individuals that is at higher risk of contracting COVID-19 as identified by the CDC, due to the petitioner's age or an underlying health condition;

    (3)  whether the petitioner has been, or has likely been, directly exposed to COVID-19;

    (4)  the physical space in which the petitioner is detained, and how that physical space affects his risk of contracting COVID-19;

    (5)  the efforts that detention facility officials have made to prevent or mitigate the spread of, or harm caused by, COVID-19;

    (6)  any danger to the community, or to the petitioner's immigration proceedings, that may be posed by the petitioner's release; and

    (7)  any other relevant factors.

*See Dada, supra (citing Saillant*, 2020 WL 1891854, at *4; *Vazquez Barrera*, 2020 WL 1904497, at *6.

Here, most of the *Saillant* factors counsel against Petitioner's immediate release.

    (1) Petitioner has not been diagnosed with COVID-19 and is not experiencing symptoms consistent with the disease;

    (2) While Petitioner is among a group of individuals that may have higher risk of complications from COVID-19, her medical condition does not elevate her risk of contracting the virus. As noted by the Government, by reason of her detention, she has greater access to medical care than many in the general public;

    (3) Petitioner does not allege that she has been exposed to COVID-19 at SLIPC, nor could she, because there are no known cases at SLIPC;

(4) her physical space is at less than a quarter capacity which allows for social distancing;

(5) SLIPC has made substantial efforts in preventing and mitigating the spread of or harm caused by COVID-19 and, in fact, has had no known cases of COVID-19; and

(6) Petitioner is under mandatory detention for re-entering the country. Her prior removal order stemmed from obviously violent felony convictions, murder and kidnaping. ICE does not have the congressional discretion to release her and has a duty to protect the community from her. She is an objective flight risk considering her previous violation of an Immigration Judge's Removal Order.

"Preventing detained aliens from absconding and ensuring that they appear for removal proceedings is a legitimate governmental objective." *Jennings v. Rodriguez*, 138 U.S. 830, 836 (2018); *Demore v. Kim*, 538 U.S. 510, 523; *Zadvydas v. Davis*, 533 U.S. 678, 690–91 (2001). Detention ceases to bear a reasonable relation to its purpose when the goal is no longer practically attainable. *Jackson v. Indiana,* 406 U.S. 715, 738 (1972); *accord Zadvydas*, 533 U.S. at 690. The prevention of absconding and ensuring future appearance is attainable by means of continuing to detain Plaintiffs.

Indeed, Petitioner has identified no instances where the government's goal of detaining a particular detainee became unattainable due to COVID-19 risk factors and continued detention. A reasonable relation therefore exists, and thus "does not, without more, amount to 'punishment.'" *Bell*, 441 U.S. at 539. Respondents have a legitimate interest in protecting the public and preventing aliens from absconding

-15-

into the United States and never appearing for their removal proceedings. *Jennings*, 138 U.S .at 836 (2018); *Demore*, 538 U.S. at 523; *Zadvydas*, 533 U.S. at 690-91. These authorities and objectives are balanced by discretionary authority that permits Respondents to consider whether release is appropriate for certain detainees. *See* 8 C.F.R. § 236.1(c)(8); 8 U.S.C. § 1182(d)(5).

Notably, Petitioner is a criminal alien, with a substantial criminal history, under mandatory detention. She was removed in 1999 pursuant to murder and kidnapping convictions and re-entered the United States despite her prior order. The Court agrees with the Government's contention that it has a legitimate, obvious and congressionally mandated objective in protecting the community from dangers posed by criminal aliens, such as Petitioner.

Finally, SLIPC currently does not have, nor has it ever had, any confirmed cases of COVID-19. The Court agrees that the lack of any COVID positive cases and the proactive measures taken by Respondents, coupled with the Petitioner's controlled medical conditions, shows that Respondents are neither punishing petitioner nor are deliberately indifferent to her medical needs.

In sum, Petitioner has not stated a constitutional violation. The Court finds that the government has an established, nonpunitive, and legitimate interest in detaining Plaintiff pending the outcome of her removal proceedings. The goal of her detention remains attainable and the evidence does not show keeping her in detention

is excessive. Furthermore, the Court also notes that while deportation to Guatemala may have been an issue in the past, the Associated Press reported on June 10, 2020, that the United Sates has resumed deportation flights to Guatemala. See "*U.S. Resumes Deportation Flights to Guatemala After Month-Long Suspension.*" Time Magazine, June 10, 2020; https://time.com/5851118/guatemala-deportations-u-s-immigration.

Moreover, the public interest is best served by allowing orderly medical processes and protocols to be implemented by government professionals. *See Youngberg v. Romeo*, 457 U.S. 307, 322-23 (1982) (urging judicial deference and finding presumption of validity regarding decisions of medical professionals concerning conditions of confinement). The Supreme Court has cautioned courts to "be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." *Bell*, 441 U.S. at 539.

This Court recognizes that the COVID-19 pandemic presents an extraordinary and unique public-health risk to society, as evidenced by the unprecedented protective measures that local, state, and national governmental authorities have implemented to stem the spread of the virus. *See Sacal-Micha v. Longoria*, No. 1:20-cv-37, 2020 WL 1518861 (S.D. Tex. Mar. 27, 2020). Additionally, it is possible that despite ICE's best efforts, Petitioner may be exposed and contract the virus. *Id.*

But the fact that ICE may be unable to implement the measures that would be required to fully guarantee Petitioner's safety does not amount to a violation of her constitutional rights and does not warrant her release. *Id. (citing Farmer v. Brennan*, 511 U.S. 825, 832 (1994) ("Prison officials must provide humane conditions of confinement and must take reasonable measures to guarantee the safety of inmates.").

Accordingly,

**IT IS RECOMMENDED** that the Motion for Temporary Restraining Order and Petition for Writ of Habeas Corpus and (rec. doc. 1) be **DENIED** and **DISMISSED WITHOUT PREJUDICE**.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days from receipt of this Report and Recommendation to file written objections with the Clerk of Court. Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days of receipt shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1429–30 (5th Cir. 1996).

THUS DONE AND SIGNED in Chambers this 6th day of July, 2020.

_____
CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE